ERIC GRANT
United States Attorney
NICHOLAS M. FOGG
KEVIN C. KHASIGIAN
Assistant U. S. Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

APPROXIMATELY $79,109,828.17 SEIZED FROM WELLS FARGO SECURITIES LLC ACCOUNT NUMBER 1BD68863, HELD IN THE NAME OF CAPSTONE LIMITED,

APPROXIMATELY $1,861,106.49 SEIZED FROM WELLS FARGO BANK ACCOUNT NUMBER 9852677500, HELD IN THE NAME OF CAPSTONE LIMITED,

APPROXIMATELY $2,056,207.08 SEIZED FROM JPMORGAN CHASE BANK ACCOUNT NUMBER 000000723026970, HELD IN THE NAME OF CAPSTONE LIMITED,

APPROXIMATELY 1,122,483.28 USDT FROM VIRTUAL CURRENCY ADDRESS TJCaXo9kCxmXXcD4yrELjvzPvAPjg2Tvhe, AND

APPROXIMATELY 54,578.45 USDT FROM VIRTUAL CURRENCY ADDRESS TKKrYKhyaLRd6oVqjCAL31akjvDkwwMHf6,

Defendants.

2:26-CV-02476-DAD-CKD

AMENDED VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

**AMENDED VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

The United States of America, by and through the United States Department of Justice and its undersigned attorneys, brings this complaint in accordance with Supplemental Rule G(2) of the Supplemental Rules Applicable to Asset Forfeiture Actions, and alleges as follows:

**NATURE OF ACTION**

1. This is a civil action *in rem* to forfeit approximately $81 million seized from two Wells Fargo accounts, approximately $2 million seized from a JPMorgan Chase ("Chase") account, and nearly $1.2 million in cryptocurrency seized from two wallets controlled by Capstone Limited ("Capstone"), a business located in Sacramento County, in the Eastern District of California. Each asset was seized pursuant to a federal warrant issued in the Eastern District of California upon a finding of probable cause by a United States Magistrate Judge.

2. Capstone obtained and maintained access to the United States financial system by repeatedly misrepresenting itself as an information technology ("IT") business rather than the money services business ("MSB") it was. Legal representatives for Wells Fargo N.A. ("Wells Fargo") told investigators that by failing to disclose it operated as an MSB, Capstone avoided additional scrutiny applied to money transmitters and was instead onboarded and monitored with Wells Fargo as a lower-risk IT company. However, receiving and transmitting value for others was not simply incidental to Capstone's business—it was its core business as a money transmitter.

3. Capstone used accounts at major United States financial institutions to move hundreds of millions of dollars for various entities, including a foreign financial entity and its customers. Capstone received funds into its accounts and sent funds out of its accounts on behalf of others. Capstone also used its accounts to facilitate a crypto-for-cash scheme, in which victims of impersonation scams sent funds to a Capstone bank account and in exchange Capstone transferred an approximately equivalent amount of cryptocurrency out of cryptocurrency wallets in their control to a third party.

4. During voluntary interviews with the FBI in early 2026, Mary Jeanne Thompson, who is frequently identified as having an ownership and/or leadership position in Capstone, advised that she did not have much to do with Capstone. Her husband, Kotaro Shimogori, who actually operated Capstone,

advised that U.S. Treasury securities belonging to a foreign cryptocurrency company were transferred to a securities account in the name of Capstone. He also advised that at the direction of a foreign financial entity, Capstone would make payments out of their account for the benefit of the foreign cryptocurrency company, which was a client of the foreign financial entity.

5. As set forth below, Capstone gained access to the U.S. financial system, then used that access to receive and transmit hundreds of millions of dollars and other things of value on behalf of others. As a result, the *in rem* defendants are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) as property involved in, traceable to, or constituting proceeds of 18 U.S.C. §§ 1014, 1343, 1344, and 1960.

a. *In Rem* Defendant Wells Fargo Securities Account No. 1BD68863 (**Wells Fargo x8863**). Capstone obtained and maintained **Wells Fargo x8863** through false statements concerning the nature of its business and its intended use of the account. Capstone received U.S. Treasury securities belonging to its customers to be transferred into this account, which was maintained solely in Capstone's name. By having the securities credited to the account, Capstone obtained security entitlements and the ability to direct Wells Fargo to sell or transfer securities held in its custody. Capstone sold or allowed the securities to mature and then transferred the U.S. dollar proceeds to **Wells Fargo x7500** where payments were made at its customers' direction. The assets seized from *In Rem* Defendant are therefore subject to forfeiture as proceeds traceable to violations of 18 U.S.C. §§ 1014 and 1344.

b. *In Rem* Defendant Wells Fargo Checking Account No. 9852677500 (**Wells Fargo x7500**). Capstone obtained and maintained Wells Fargo x7500 through false statements concerning the nature of its business and its intended use of the account. Capstone used **Wells Fargo x7500** to receive and transmit funds on behalf of others, including proceeds from the sale or maturity of U.S. Treasury securities from **Wells Fargo x8863**. Funds credited to **Wells Fargo x7500** were held in an account in Capstone's name, giving Capstone the ability to disburse those funds. Capstone also conducted these transactions

as a money transmitting business without the state licenses required for numerous transactions involving domestic parties. The funds seized from **Wells Fargo x7500** are subject to forfeiture as proceeds traceable to violations of 18 U.S.C. §§ 1014 and 1344 and as property involved in violations of 18 U.S.C. § 1960.

c. *In Rem* Defendant Chase Account No. 723026970 (**Chase x6970**). Capstone used **Chase x6970** to receive and transmit funds on behalf of others. Capstone also received funds from victims of impersonation schemes into **Chase x6970** and transmitted them onward as part of its cash-for-crypto business. The seized balance included funds traceable to the impersonation fraud scheme and funds involved in Capstone's unlicensed money transmitting activities. The funds seized from **Chase x6970** are subject to forfeiture as proceeds traceable to violations of 18 U.S.C. § 1343 and as property involved in violations of 18 U.S.C. § 1960.

d. *In Rem* Defendants Cryptocurrency Wallets. Capstone used wallet addresses **2Tvhe** and **wMHf6** to transmit cryptocurrency to third parties in exchange for funds received into **Chase x6970**. Some of these senders were victims of impersonation fraud. The wallets were used to complete money transmitting transactions in which Capstone received funds from one person and transmitted them onward to another without the required state money transmission licenses. The cryptocurrency seized from these wallets is subject to forfeiture as property involved in violations of 18 U.S.C. § 1960.

**<u>JURISDICTION AND VENUE</u>**

6. This Court has jurisdiction over an action commenced by the United States under Title 28, United States Code, Section 1345, and over an action for forfeiture under Title 28, United States Code, Section 1355(a).

7. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. §§ 1355 and 1395, because the acts and crimes giving rise to forfeiture took place in this district and the property is found in this district.

8. The *in rem* defendants are now, and during the pendency of this action will be, in the

jurisdiction of this Court.

## FACTS GIVING RISE TO FORFEITURE

9. When opening bank accounts in Capstone's name, its owners made false statements about the nature of Capstone's business and its intended use of the accounts and did not disclose that Capstone would receive and transmit funds on behalf of others. Once opened, Capstone used the accounts for precisely that purpose. The allegations below describe how Capstone repeated this conduct across multiple financial institutions while moving hundreds of millions of dollars or other things of value to recipients in countries throughout the world.

### A. Capstone Limited

10. Capstone Limited was incorporated in Montana on or about September 9, 2024. The articles of incorporation listed Capstone's business purpose as "IT Services." The articles of incorporation and Capstone's annual reports in 2025 and 2026 listed Mary Jeanne Thompson as Capstone's president and director. The 2025 and 2026 annual reports listed a Sacramento County address as Capstone's physical address.

11. Two days after incorporating, on or about September 11, 2024, Capstone filed to register as a money services business ("MSB") with the Financial Crimes Enforcement Network ("FinCEN").[1] It listed its locations as "Foreign locations" and Montana and its MSB activities as "Money transmitter" and "Dealer in foreign exchange." The registration listed Kotaro Shimogori as the "Owner or controlling person" of Capstone and the "Compliance Contact." Finally, the registration listed a Wells Fargo checking account ending in x7500 ("**Wells Fargo x7500**") as Capstone's "Primary Transaction Account."

12. Capstone renewed its MSB registration with FinCEN in October 2025. At that time, Mary Jeanne Thompson replaced Kotaro Shimogori as Capstone's "Owner or controlling person" and "Compliance Contact." Capstone identified its MSB activity as "Money Transmitter," its location as Montana, and its primary transaction account as **Wells Fargo x7500**.

13. In addition to **Wells Fargo x7500**, Capstone ran the same business through accounts at

[1] FinCEN is a bureau of the U.S. Department of the Treasury responsible for administering the Bank Secrecy Act and maintaining the federal registration system for MSBs.

Citibank ("Citi") and Chase. However, in June 2025, prior to the MSB renewal in October 2025, Citi moved to close Capstone's account "due to identified AML concerns."[2]

**B. Capstone's Principal Customers and Counterparties**

14. Dominica Bank 1 is an offshore bank registered in the Commonwealth of Dominica. The evidence indicates that it arranged for Capstone to process transactions for its customers—including Cryptocurrency Company 1 and Cryptocurrency Exchange 1. In a signed agreement between Dominica Bank 1 and Capstone dated August 20, 2024, it stated Capstone "is a FinCEN-registered technology development company and money service business," which "administers and operates a payment processing and gateway services infrastructure that enables customers to make and receive payments and other transaction types." It further stated Dominica Bank 1 sought to process its payments through Capstone and wished "to make available to its customers those payment services provided by [Capstone] relating to payment transactions." Capstone agreed to provide "Fiat Currency Exchange" and "Fraud Protection."

15. Dominica Bank 1's quarterly reporting package to Dominica's Financial Services Unit for the quarter ended December 31, 2025, reported approximately $61 million in off-balance-sheet assets, substantially more than the assets carried on its balance sheet, of less than $48 million. A substantial majority of the assets Dominica Bank 1 did carry on its balance sheet, approximately 65%, were held in U.S. bank accounts.

16. Cryptocurrency Company 1 is a foreign entity that issues a "stablecoin" pegged at 1-to-1 with a matching fiat currency. For example, one stablecoin equals one U.S. dollar. Individuals associated with Cryptocurrency Company 1 are also affiliated with Cryptocurrency Exchange 1. According to Cryptocurrency Company 1's public statements, its holdings of United States Treasury securities would rank it as among the world's largest holders.

17. The relationships with Dominica Bank 1, Cryptocurrency Company 1, and Cryptocurrency Exchange generated inflows to Capstone from a variety of third parties, including domestic and foreign money services businesses and other financial and digital asset companies. The

---

[2] "AML" refers to Anti-Money Laundering, the practices and policies banks implement to identify and prevent financial crime.

funds did not pass through accounts held by Dominica Bank 1 or Cryptocurrency Company 1. Neither was disclosed as a beneficial owner of Capstone's bank accounts. Capstone instead received the funds directly and transmitted them onward.

**C. Money Transmission Requirements**

18. Money transmitters in the U.S. are regulated at both the federal and state level. A money services business must accurately and completely disclose the nature and geographic scope of its activities in its FinCEN registration and maintain an effective program to identify and address money-laundering risks.

19. A money transmitter license ("MTL") is required in every state but Montana, which exempts most money transmission activities from state licensing, State registration is in addition to Federal registration. Although Capstone registered with FinCEN as a money transmitter, its initial filing in September 2024 identified only Montana and "foreign locations" as its "locations of registrant." In its October 2025 registration renewal, Capstone listed only Montana as its "locations of registrant" despite Kotaro Shimogori and Mary Jeanne Thompson being physically based in Sacramento County, California.

20. FinCEN maintains a publicly available "MSB Registrant Search" through which individuals and entities can review an MSB's registration status information. Capstone registered as a money transmitter and presented itself to others as a compliant MSB, at times using FinCEN's name or logo in its communications.

**D. Capstone's Early Operations**

21. By the fall of 2024, Capstone had established a business relationship with Dominica Bank 1. Around the same time, Capstone established banking relationships with Citi and Wells Fargo.

**E. Capstone's Citibank Accounts**

22. On or about October 7, 2024, an account in Capstone's name was opened at Citi, a checking account ending in x5973 ("**Citi x5973**"). Mary Jeanne Thompson's title was listed as "President/Chairperson", and an "HRB Description"[3] stated "Send/Receive funds to/from countries outside the U.S." A "Beneficial Ownership Declaration" stated Mary Jeanne Thompson's "Ownership or

[3] "HRB" refers to High-Risk Behavior, a designation used in bank compliance to identify activities that present elevated risk.

Contribution" of Capstone as 100%. No other owners, controlling persons, or authorized signers were listed.

23. In the Citi opening paperwork, Capstone was described as an "Application Development service" with 50 employees/agents and expected to receive monthly wire transfers of "$2.5 Million or more" in "51 or more" transactions per month, and send wire transfers of "$2.5 Million or more" in "21-50" wire transactions per month, to include sending wires outside of the U.S. for payments of invoices and receiving wires from outside the U.S. for the payment of services. In response to questions asking, "Will you provide… foreign currency services, money transmission services…" and "Will you hold or transact any funds in the account that belong to one or more of your customers and are not part of your business' operating funds?", "No" was checked. These statements were false. Capstone was, in fact, a money transmitter and intended to use **Citi x5973** for that purpose.

24. Once opened, the activity in **Citi x5973** demonstrated that Capstone was engaged in money transmitting rather than application development. In October 2024, the only deposit activity was five wire transfers into the account from a Capstone account in the name of Capstone Limited US at Reliz Ltd d/b/a Blockfills, a crypto trading and fintech firm, totaling more than $1.5 million, each deposit was followed by a series of international wires out of the account. On October 29, 2024, for example, a $686,204.96 wire from Blockfills arrived in the account, which had held $759.62. That same day, Capstone sent five international wires totaling $679,444.33 out of **Citi x5973**, including fees for international funds transfers, leaving a balance in the account of $7,520.25. Beginning in November 2024 and continuing through May 2025, numerous outgoing wires included a reference believed to be referring to Cryptocurrency Exchange 1, appearing to indicate the wires were sent on behalf of Cryptocurrency Exchange 1.

25. In November 2024, Capstone expanded its relationship with Citi by opening Personal Wealth Management account ending in x3086 ("**Citi x3086**"). The account opening materials included an internal "CitiKYC – Account Opening Record." Among the check-box questions in the forms were two focused on whether Capstone was a payment intermediary or handled funds on behalf of others. The first asked whether Capstone was a payment intermediary—a money services business, payment service

provider, third-party payment processor, or foreign-currency exchanger. The second asked whether Capstone made payments or collections for third parties, held or warehoused third-party funds, or conducted exchange operations on third-party funds. Both boxes were marked "No." The form stated that an affirmative answer to either question would block the opening of a bank account. Once Capstone's account was opened, tens of thousands of dollars' worth of securities were deposited into **Citi x3086**.

**F. Capstone's Wells Fargo Accounts**

26. On or about September 9, 2024, Capstone opened **Wells Fargo x7500**. Kotaro Shimogori and Mary Jeanne Thompson opened the account at a Wells Fargo branch in Sacramento County, California.

27. The documents discussed below were completed by a Wells Fargo banker based on information provided by Kotaro Shimogori and Mary Jeanne Thompson.

28. The Business Account Application for **Wells Fargo x7500** was signed in Mary Jeanne Thompson's name. It listed Mary Jeanne Thompson as a signer on the account and "Owner with Control of the Entity" with 100% ownership. Capstone's business was described as "Computer IT Services and Installation."

29. An Enhanced Due Diligence Customer Activity Screening form was completed the same day, on or about September 9, 2024. In the section of the form addressing Money Services Businesses, the form asked, "Does your company accept funds, currency, or Virtual/Internet currency . . . from customers and send/transmit the funds, currency, or Virtual/Internet currency to another person or location? (Money Transmission)?" The response on the form was "No." Had the response been "Yes," further due diligence would have been required. These statements were false. Capstone was, in fact, a money services business that engaged in money transmitting and intended to use **Wells Fargo x7500** for that purpose. Shimogori and Thompson knew these statements to be false and made them for the purpose of influencing Wells Fargo to open **Wells Fargo x7500**.

30. Two days after opening **Wells Fargo x7500**, on or about September 11, 2024, Capstone filed to register with FinCEN as a money services business.

31. From the opening of **Wells Fargo x7500**, on or about September 9, 2024, to in or about March 2025, funds were deposited into **Wells Fargo x7500** and then, that same day or shortly thereafter, an almost equal amount was withdrawn. For example, on or about October 10, 2024, $19,455 was deposited into **Wells Fargo x7500**, and that same day, approximately $19,473 was withdrawn and transferred to a bank in China. On another occasion that month, approximately $27,685 was deposited and the same day, approximately $27,660 was withdrawn and transferred to a bank in China.

32. In or about February to March 2025, Capstone expanded its relationship with Wells Fargo when the securities account ending in x8863 ("**Wells Fargo x8863**") was opened. During the opening of that account, Capstone again described itself as an IT company.

33. On or about February 19, 2025, as part of the process of opening **Wells Fargo x8863**, Wells Fargo emailed account opening documents to Kotaro Shimogori, Mary Jeanne Thompson, and Capstone's Chief Operating Officer ("COO"). One of the documents was a "Customer Information Form." The next day, Mary Jeanne Thompson's email returned a completed "Customer Information Form" to Wells Fargo. The form described the nature of Capstone's business as "Information Technology and Fintech." The form also listed the NAICS[4] code for Capstone as 518210, which is the code for Computing Infrastructure Providers, Data Processing, Web Hosting, and Related Services. These statements were false. Capstone was, in fact, a money services business that engaged in money transmitting. Money transmitters and payment intermediaries are instead classified under NAICS 522320. Capstone opened **Wells Fargo x8863** intending to use it to hold assets it would later transfer to, and then out, of other accounts such as **Wells Fargo x7500**. Shimogori and Thompson knew that statements made to Wells Fargo to open **Wells Fargo x8863** were false and made them for the purpose of influencing Wells Fargo to open **Wells Fargo x8863**.

34. The distinction was significant because Wells Fargo uses the customer's stated business activities and industry classification to assess Bank Secrecy Act/AML risk and determine whether additional due diligence is required. Pursuant to FinCEN guidance, money services businesses present

---

[4] The North American Industry Classification System (NAICS) is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy.

distinct compliance risks and banks are required to understand the MSBs nature and purpose in order to assess risk and apply appropriate monitoring and controls.

35. On or about February 26, 2025, Wells Fargo completed a form titled "CIF-Internal Use" based on information provided by Capstone. The form listed several "High Risk Attributes" which may apply to the customer, including "Third Party Payment Processor," "Virtual Currency," "Money Service Business," and "Correspondent 3rd Party Trading." The form had checked the "None of the Above" box for those attributes.

36. Capstone misrepresenting the nature of its business in the opening of **Wells Fargo x7500** and **Wells Fargo x8863** was material because the false statements shaped Wells Fargo's understanding of the business. That understanding, in turn, influenced the due diligence Wells Fargo conducted and whether it would even open the account. A business described as an MSB or payment intermediary would receive more rigorous due diligence than a business described as a software or information technology business.

37. Other documents undercut Capstone's claims it was an IT business. For example, a reference letter for Dominica Bank 1, dated April 15, 2025 and on Capstone letter head, described Capstone as "a duly registered Money Service Business…authorized by…(FinCEN) for issuing electronic money and providing payments services." The letter described Dominica Bank 1 as "a highly valued client of Capstone" and said Dominica Bank 1 "maintains multiple currency accounts" with Capstone. Similarly, a Capstone PowerPoint presentation, dated with the year 2025, and titled, "Revolutionizing Global Liquidity, Payments, and Treasury Management" listed Capstone's core capabilities as Global Payments and Foreign Exchange; T-Bills; Liquidity and Treasury Management Services, Multi-Currency and Cryptocurrency Support; Money Market Fund; and an API-Driven Platform. The presentation concluded, "Contact us today to discover how our integrated financial ecosystem can transform your treasury, liquidity, and payments operations."

38. Finally, a copy of a letter on Capstone letterhead, dated August 7, 2025 and located on a computer at Kotaro Shimogori and Mary Jeanne Thompson's residence during the execution of a search warrant signed in Kotaro Shimogori's name, proposed an alliance with a foreign entity stating: "We will

supply and maintain the underlying technology stack, global payment rails, liquidity management, and round-the-clock compliance and operational support, ensuring every transaction flows seamlessly and in full regulatory conformity." The letter described Capstone as a money services business and lauded its "Trusted banking network" including "direct integration with Wells Fargo... and other Tier-1 partners[.]"

39. On or about May 30, 2025, Citi emailed Capstone advising: "As part of the bank's regular review process, a recent assessment has led to a decision regarding your relationship […] Effective immediately, all your accounts have been blocked and are scheduled for closure on June 27th. Should you wish to transfer funds to another financial institution, please coordinate directly with your service officers[.]"

40. Capstone sent a letter instructing Citi to close/liquidate various accounts and send the balances to **Wells Fargo x7500**. The letter, dated June 2, 2025, was on Capstone letterhead and signed in Mary Jeanne Thompson's name. Internal Citi communications noted the closure of the account(s) was "due to identified AML concerns."

41. It was around this time, June 2025, the activity in the Wells Fargo accounts increased significantly from a few transactions a month to multiple transactions a month. Bank statements and records for Capstone's Wells Fargo accounts identified large movements of money into and out of the accounts.

42. In or about December 2025, Capstone and Wells Fargo discussed opening a commercial banking account at Wells Fargo. During this process, Wells Fargo discovered that Capstone was registered as an MSB with FinCEN.

43. In January 2026, Wells Fargo asked Capstone about its apparent operation as an MSB. In a letter dated January 30, 2026, signed in Mary Jeanne Thompson's name, Capstone denied being an MSB. Instead, Capstone claimed it "is a technology and software development company" and that payments made to its accounts from clients were "solely" for "services rendered, including software development, technical consulting, platform implementation, and ongoing operational support." Capstone advised that approximately $100 million in treasury and liquidity instruments represented Capstone's own capital. In the letter, Capstone expressly denied that it accepted or held customer funds

for transmission; provided remittance, payment-processing services or money services; executed payments on behalf of clients; or maintained custodial, escrow, trust, or clearing accounts. As such, Capstone claimed it "does not operate as a Money Services Business" and that its wire activity reflected normal revenue and expenses consistent with a global technology services company.

44. The false statements to Wells Fargo to open **Wells Fargo x7500** and **Wells Fargo x8863** were part of a scheme to defraud Wells Fargo of money and property. That money and property included access to Wells Fargo accounts and related infrastructure, funds owned by Wells Fargo in **Wells Fargo x7500**, and securities under its control in **Wells Fargo x8863**. Through these accounts, Capstone obtained control over customer-owned U.S. Treasury securities and the resulting U.S. dollar proceeds which were deposited into **Wells Fargo x7500**, and used to disburse funds to third parties.

45. The purpose of the false statements to Wells Fargo was not merely to open **Wells Fargo x7500** and **Wells Fargo x8863**, but to obtain control over funds and securities held by Wells Fargo and to give Capstone's customers, including Dominica Bank 1 and its clients, access to the United States banking system. Obtaining and maintaining the ability to direct the disposition of this property was an objective of Capstone's scheme, not merely an incidental consequence of obtaining banking services.

46. Because of the lies told to Wells Fargo, the bank opened **Wells Fargo x7500** and **Wells Fargo x8863**. Without those accounts, Capstone would not have had control over the customer-owned securities credited to **Wells Fargo x8863**, the resulting U.S. Dollar proceeds, or the funds deposited into **Wells Fargo x7500**.

47. Wells Fargo is a bank that is insured by the Federal Deposit Insurance Corporation.

**G. Capstone's JPMorgan Chase Account**

48. In June of 2025, Capstone opened Chase business checking account ending in x6970 ("**Chase x6970**"). **Chase x6970** appeared to be used primarily for two purposes. First, **Chase x6970** operated as part of Capstone's money-transmitting business by receiving funds from Capstone's Wells Fargo accounts into **Chase x6970** and then transferring funds out of **Chase x6970**, many of which were international transfers and appeared to be sent to individuals and entities on behalf of Cryptocurrency Company 1/Cryptocurrency Exchange 1.

49. Second, **Chase x6970** was used to receive proceeds of impersonation fraud schemes. In such a scheme, a fraudster poses as a government or law-enforcement official to coerce a victim into transferring money. At the fraudsters' direction, victims sent funds to **Chase x6970**.

50. The schemes here followed a familiar script. A fraudster contacted a victim posing as a representative from a credit-card company, claiming a card in the victim's name had been used for attempted purchases. The victim was then transferred to a second fraudster posing as a law enforcement official. The victim was told accounts associated with them were used in money laundering schemes being investigated. Victims were threatened with arrest or the freezing of their assets if they did not comply with the fraudsters' demands, which included the sending of money for various purposes. Victims were directed to send money to **Chase x6970**. To make the demands appear legitimate, the fraudsters supplied fabricated documents. The statements and demands made by the fraudsters to their victims had the natural tendency to influence the victims to part with their money.

51. The fraudsters contacted the victims using digital devices and the internet. The victims lived in numerous states including California, Colorado, Nevada, Ohio, and New York. Contacting victims in multiple states through digital devices and the internet requires the use of wire transmissions that cross state or international boundaries.

52. The experience of several victims illustrates the scheme:

a. Victim 1, then 69, received a call about a Citi card supposedly being used to attempt to buy a rifle. Victim 1 was transferred to a purported FBI agent and was told he was a person of interest in a multinational money-laundering scheme, and his assets would be frozen unless he cooperated. Victim 1 received a counterfeit FinCEN letter and a welcome letter from a foreign company, both of which identified **Chase x6970** as the designated account to receive funds. On or about December 29, 2025, Victim 1 transferred $868,000 to **Chase x6970**. After sending the money he doubted the transaction and contacted his bank and the FBI. Chase transferred the funds back to Victim 1's bank.

b. Victim 2, an individual over 70, received a call about an American Express card

supposedly being used to attempt to buy guns. Victim 2 was transferred to the purported FBI who told her she appeared to be involved in major crimes and would be arrested unless she posted "bail" equal to a portion of her assets. Victim 2 transferred $100,000 on or about December 19 and $200,000 on or about December 23, 2025, to **Chase x6970**.

c. Victim 3 received a call about a Citi card supposedly being used to buy guns. Victim 3 was transferred to a purported FBI agent who told him his name was associated with an account involved in laundering $2.38 million. After paying half that sum to the fraudsters, he was told to send an additional $595,000 as "proof of funds." In all, Victim 3 sent more than $1.6 million to the fraudsters, including $245,000 to **Chase x6970** in three transfers between December 17 and 19, 2025.

53. When Chase questioned the $868,000 wire from Victim 1, they were provided with a "Capstone Limited - Contract Service Agreement" dated May 20, 2025 between Capstone and a foreign counterparty which stated Capstone was to provide "software development and related technology services;" a Capstone invoice dated November 12, 2025 billing the foreign counterparty $1,900,000 for software licensing, web development, advanced web modules and API Integration among other things; and a billing statement from the foreign counterparty charging Victim 1 $868,000 for "Services Rendered." On a call with Chase, Thompson could not answer basic questions and deferred to Kotaro Shimogori, who gave contradictory accounts of who supplied the software —Capstone or a foreign counterparty—and claimed Victim 1 purchased a medical billing system. Chase identified no bona fide software development work and concluded the software references "appear to be fictitious."

54. Capstone's own COO refuted the software account. On January 21, 2026, Capstone's COO reported to the Miami Beach Police Department ("MBPD") that on December 29, 2025, he had "sold nine hundred thousand dollars worth of USDT Tether, TRC20 coins" to Victim 1, sent the coins to a wallet, and received a wire that was later recalled. The "Executive Summary" the COO submitted to the MBPD stated that "U.S. bank wires were received into Capstone's JPMorgan Chase account for the purchase/settlement of USDT (Tether)… After USDT settlement was delivered on-chain pursuant to

instructions from Capstone's institutional counterparty, the originating wire(s) were recalled/claimed as fraudulent." Capstone thus described the same funds as related to software to Chase and as the purchase of cryptocurrency to the police.

55. Each victim deposit into **Chase x6970** was followed, generally within a day, by a transfer of a nearly identical amount of USDT, a cryptocurrency,— less fees— to a wallet controlled by a foreign counterparty. Capstone's own trade-support chats quoted the conversion for some impersonation fraud victims, a methodology which investigators then applied to other victims of the scheme.

a. After Victim 2's $200,000 posted on or about December 23, 2025, a chat on or about December 24 quoted "For [Victim 2] USD to USDT — quote for 200,000.00 USD… Amount to be received in USDT: 199,570.00 USDT," and then that exact amount was sent to the foreign counterparty's cryptocurrency wallet.

b. For Victim 1's $868,000, the chats quoted "Amount to be received in USDT: 866,234.00 USDT" and scheduled an initial settlement of 500,000 USDT to be combined with another individual's full settlement of 29,910 USDT. On or about December 30, 2025, 529,910 USDT was transferred to the foreign counterparty's cryptocurrency wallet.

56. Victims sent money into **Chase x6970** throughout December 2025. When the final victim deposit posted in **Chase x6970**, on or about December 31, 2025, **Chase x6970** held $2,524,207.08. Three transactions occurred after this time, two of which are believed to be funds that Chase returned to victims, and the third was a $500,000 transfer into **Chase x6970** from **Wells Fargo x7500**, resulting in a seized balance of $2,056,207.08 from **Chase x6970**— the defendant Chase account.

57. The seized balance of **Chase x6970** was commingled but included payments from the impersonation fraud scheme victims and funds transferred from **Wells Fargo x7500**. The funds thus reflected both the impersonation fraud scheme and Capstone's money transmitting activities. Capstone used **Chase x6970** in both.

**H. Impersonation Fraud and Capstone's Unlicensed Money Transmitting Business**

58. Capstone used its **Chase x6970** account and two cryptocurrency wallets to operate an

unlicensed money transmitting business. This business operated by receiving the funds from persons in the United States into the **Chase x6970** account and then transmitting those funds onward as cryptocurrency using cryptocurrency wallets, including the cryptocurrency wallets TJCaXo9kCxmXXcD4yrELjvzPvAPjg2Tvhe ("wallet address **2Tvhe**") and TKKrYKhyaLRd6oVqjCAL31akjvDkwwMHf6 ("wallet address **wMHf6**). Many of the persons whose funds were transmitted onward were victims of impersonation fraud.

59. On or about February 27, 2026, the FBI executed a search warrant at Kotaro Shimogori and Mary Jeanne Thompson's residence. During the search, the FBI seized a SanDisk Cruzer Blade 8GB flash drive later determined to contain an executable file for the Utila platform and Utila recovery keys.[5] The Utila recovery keys stored on the flash drive allowed the FBI to access the content stored within Utila. The content contained cryptocurrency public wallet addresses and their corresponding private keys, including the wallet addresses and private keys for wallet addresses **wMHf6** and **2Tvhe**.

60. On or about December 18, 2025, the **Chase x6970** account received $200,000 from a resident of California and $30,000 from a resident of Colorado. On or about December 19, 2025, Capstone transferred 229,480 USDT out of its wallet address **wMHf6** to cryptocurrency wallet 1.

61. On or about December 23, 2025, the **Chase x6970** account received $200,000 from a resident of Nevada. On or about December 24, 2025, Capstone transferred 199,570 USDT out of its wallet address **wMHf6** to cryptocurrency wallet 1.

62. On or about December 29, 2025, the **Chase x6970** account received $30,000 from a Florida resident and $868,000 from an Ohio resident. On or about December 30, 2025, the **Chase x6970** account received $100,000 from a New York resident and $50,000 from a California resident. Also on or about December 30, 2025, wallet address **wMHf6** sent 529,910 USDT to cryptocurrency wallet 1. On or about December 31, 2025, wallet address **2Tvhe** sent 515,874 USDT to cryptocurrency wallet 1.

63. On or about December 29, 2025, the **Chase x6970** account received $100,300 from a Florida company. On or about December 30, 2025, wallet address **wMHf6** sent 100,099.70 USDT to cryptocurrency wallet 2. Also on or about December 30, 2025, the **Chase x6970** account received

[5] Utila is a company offering digital-asset custody and wallet services.

another $100,300 from the same Florida company. On or about December 31, 2025, wallet address **2Tvhe** sent 100,099.70 USDT to cryptocurrency wallet 2.

64. On or about December 31, 2025, the **Chase x6970** account received $50,000 from a Florida resident. On or about January 2, 2026, the wallet address **2Tvhe** sent 49,870 USDT to cryptocurrency wallet 1.

65. Capstone was required under the laws of California, Colorado, Florida, Nevada, New York, and Ohio to have a state license to engage in the money transmitting described above but did not have such a license in any of those states. Capstone's unlicensed conduct was punishable as a misdemeanor or felony under the laws of those states. The pertinent state laws include California Financial Code §§ 2001 *et seq*.; Colorado Revised Statutes §§ 11-110-101 *et seq*.; Florida Revised Statutes § 560.103 *et seq*.; Nevada Revised Statutes §§ 671.004 *et seq*.; New York Banking Law §§ 640 *et seq*.; Ohio Revised Code §§ 1315.01 *et seq*.

### I. Involvement of Wells Fargo x7500 in Capstone's Money Transmitting Business

66. **Wells Fargo x7500** was also part of Capstone's money transmitting business.

67. Bitcoin ATM Company 1 is a Florida corporation that operates cryptocurrency kiosks. On or about January 2, 2025, Bitcoin ATM Company 1 wired $55,000 to Capstone's **Citi x5973**. It sent at least nine more wires over the following months—including a $55,000 wire to Capstone's **Wells Fargo x7500** on or about October 30, 2025 with a notation referencing Dominica Bank 1—totaling $424,000. Dominica Bank 1 was an entity for which Capstone provided money transmitting services.

68. Capstone also received funds from others in Florida. On or about August 1, 2025, Capstone received $48,150 from Florida Company 1, a business in Florida. On or about August 7, 2025, a Florida resident with initials "L.C." wired $50,000 to Capstone, with a notation referencing Dominica Bank 1. On or about September 2, 2025, a Florida resident with the initials "M.V." wired $750,000 to Capstone. On or about September 24, 2025, a Florida resident with initials "I.M." wired $2,800 to Capstone, with a notation referencing Dominica Bank 1.

69. In Florida, a company that receives money from a person or business in the State to send onward to others must be licensed as a money transmitter, and operating without that license is a felony.

Capstone held no Florida license.

70. Multiple businesses located in California sent funds to **Wells Fargo x7500**. California Company 1, whose principal place of business is in California[6], wired $157,796 to **Wells Fargo x7500** on or about July 24, 2025, with a notation referencing Dominica Bank 1. On or about June 24, 2025, two funds operating from the same business address in California wired approximately $2.9 million and approximately $1.09 million, to **Wells Fargo x7500** with a notation referencing Dominica Bank 1. In total, these California businesses sent more than $4.1 million to **Wells Fargo x7500**. In California, a company that receives money from a person in the State to transmit onward must be licensed as a money transmitter, and engaging in that business without a license is a felony. Capstone held no California license.

71. On or about October 27, 2025, Missouri Resident 1 wired $250,000 to **Wells Fargo x7500**. The wire bore a notation referencing Dominica Bank 1. In Missouri, a company that receives money from a person in the State to transmit onward must be licensed as a money transmitter, and knowingly doing so without a license is a felony. Capstone held no Missouri license.

### J. Capstone's Money Transmitting Business and Money Movement Through Capstone's Accounts

72. Capstone operated an unlicensed money transmitting business through the defendant assets and the Chase accounts from its earliest transactions through the seizure of the defendant funds. The pattern appeared at the outset and never changed. The first substantial activity in Capstone's Citi accounts, in October 2024, was a series of domestic wires from a Capstone account at Blockfills, followed by a series of international wires out of the account. The first activity in **Wells Fargo x7500**, around that same month, was deposits into **Wells Fargo x7500** and then withdrawals, that same day or shortly thereafter, in an almost equal amount out of the account. The pattern of receiving funds and sending funds, predominantly to individuals and entities abroad, defined Capstone's business.

73. Capstone added a second method at scale: the deposit of U.S. Treasury securities owned by others received into brokerage accounts, liquidated, and the proceeds moved to a checking account to

[6] The wire-transfer documents, however, listed a Nevada address for California Company 1's bank account.

be used to send wires to recipients, the majority of which were abroad. The accounts functioned together as a single money-transmitting operation. For example, the Wells Fargo brokerage account (**Wells Fargo x8863**) received and liquidated U.S. Treasury securities owned by others, and the Wells Fargo checking account (**Wells Fargo x7500**) received those funds which were used to send wires, mostly abroad. Neither could carry on the business without the other, and together they moved hundreds of millions of dollars on behalf of others.

74. In or about March and April 2025, approximately $15 million was transferred from **Citi x5973** to **Wells Fargo x7500**. This approximately $15 million was then used to purchase treasuries in **Wells Fargo x8863**, which was opened around that time, in or about March 2025.

75. As discussed above, on or about May 30, 2025, Citi notified Capstone of their intention to close Capstone's accounts at Citi. In June 2025, approximately $65 million transferred from Capstone's Citi accounts into **Wells Fargo x7500**.

76. In or about July 2025, Capstone started investing with Wells Fargo in money market mutual funds in addition to treasuries. The money market mutual funds were also held in **Wells Fargo x8863**.

77. From in or about March 2025 (around the opening of **Wells Fargo x8863**) to on or about December 31, 2025, hundreds of millions of dollars flowed between **Wells Fargo x7500** and **Wells Fargo x8863**.

78. During that time period, from in or about March 2025 to on or about December 31, 2025, more than $718 million was deposited into **Wells Fargo x7500**, of which approximately $560 million was from **Wells Fargo x8863** because of the sale or maturity of treasuries and trades related to money market mutual funds. More than $717 million was withdrawn from **Wells Fargo x7500**, of which more than $379 million was transferred to **Wells Fargo x8863** for the purchase of treasuries or trades related to money market mutual funds.

79. Excluding the treasuries and money market mutual funds discussed above, approximately $158 million was deposited into **Wells Fargo x7500** and approximately $337 million was withdrawn from **Wells Fargo x7500**. Of the $337 million withdrawn from **Wells Fargo x7500** almost two-thirds

appeared to go to hundreds of individuals and entities on behalf of Cryptocurrency Company 1/Cryptocurrency Exchange 1.

80. On one of Shimogori's digital devices, investigators found a draft of an unsigned, agreement between Capstone, Dominica Bank 1, and Cryptocurrency Exchange 1. Investigators do not know if the agreement was ever executed. The date of the draft agreement left the month and day blank but had the year 2026. The draft agreement defined Cryptocurrency Exchange 1 as the "Client," Dominica Bank 1 as the "Custodian," and Capstone as the "Sub-Custodian."

81. The draft agreement illustrates the operation of Capstone's money-transmitting business.

82. The draft agreement provides "The Custodian shall establish and maintain a Custody Account and a Cash Account . . . for the deposit of shares, securities (including T-Bills), financial assets, debentures, cash and any other items of property or assets credited to or held from time to time in trust for the benefit of the Client (collectively, the 'Custody Assets')." The agreement defined "Custody Account" and "Cash Account" as accounts at "in the name of Sub-Custodian at Wells Fargo."

83. While the draft agreement references a "Wells Fargo Capstone Custody Agreement" and a "Wells Fargo Bank, N.A. Safekeeping Agency Agreement," Wells Fargo did not approve Capstone using **Wells Fargo x7500** and **x8863** to operate a money transmitting business.

84. The draft agreement went on, "Client holds the sole undivided beneficial interest in the Custody Assets. Neither Custodian or Sub-Custodian acquires any proprietary right." The draft agreement specifically provided, "USD and securities constituting Custody Assets may be held in one or more omnibus accounts with Wells Fargo in accordance with applicable law."

85. Finally, the draft agreement said, "The Client's entitlements are identified on the books and records using an internal client reference code (the 'Client Code'), currently "BFX-WW-Inc/Reference/[number]." "No Client-named sub-account is created at the bank or securities intermediary by virtue of the Client Code."

86. Capstone's actual banking activity was consistent with the arrangement described in the draft agreement. For example, **Wells Fargo x7500** and **x8863** are consistent with the "omnibus accounts with Wells Fargo" described in the draft agreement. In another example, in the bank statements for

**Chase x6970**, the notations for outgoing transfers often included the language "Obobfx-Ww/Inc/Reference" followed by a number.

87. Further, **Chase x6970** and the Utila wallets were used to receive victim funds and settle them in cryptocurrency, as described above. The defendant funds—approximately $79,109,828.17 seized from **Wells Fargo x8863**, approximately $1,861,106.49 seized from **Wells Fargo x7500**, approximately $2,056,207.08 seized from **Chase x6970**, and the USDT seized from the two cryptocurrency wallets—were all involved in that unlicensed money transmitting business.

88. In addition, for the most part, starting in June of 2025, two transactions in the same amount or approximately the same amount, were transferred out of **Wells Fargo x7500** at the end of the month or the beginning of the next month. One transaction went to an account in the name of a business associated with Mary Jeanne Thompson and the other transaction went to accounts in the names of businesses associated with Capstone's COO.

89. Capstone took deliberate steps to avoid the scrutiny applied to money transmitters. Capstone was familiar with money service businesses and money transmitter requirements, yet repeatedly represented itself to banks as an information technology company rather than a business that received and transmitted funds for others. Those misrepresentations were designed to frustrate the banks' due diligence and to avoid the customer monitoring, suspicious-activity reporting, and other Bank Secrecy Act obligations that Capstone's true business would have triggered.

## FIRST CLAIM FOR RELIEF
## 18 U.S.C. § 981(a)(1)(C)

90. The above allegations are incorporated by reference as though fully set forth herein.

91. The defendant assets **Wells Fargo x8863** and **Wells Fargo x7500** constitute, or are derived from, proceeds traceable to one or more offenses constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), and are therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C). Those specified unlawful activities are bank fraud, in violation of 18 U.S.C. § 1344 and the making of false statements to financial institutions, in violation of 18 U.S.C. § 1014. Through the false statements, Capstone obtained and maintained accounts in its own name through which

it acquired security entitlements in customer owned Treasury securities and deposit claims over funds credited to Wells Fargo. Those property interests permitted Capstone to direct the sale, transfer, and disbursement of assets held through Wells Fargo's custody or control. The defendant assets seized from **Wells Fargo x8863** and **Wells Fargo x7500** constitute or are derived from the property interests Capstone acquired through these falsely procured banking arrangements and are traceable to the violations of 18 U.S.C. §§ 1014 and 1344.

**SECOND CLAIM FOR RELIEF**
**18 U.S.C. § 981(a)(1)(C)**

92. The above allegations are incorporated by reference as though fully set forth herein.

93. The defendant asset **Chase x6970** constitutes, or is derived from, proceeds traceable to one or more offenses constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), and are therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C). That specified unlawful activity is wire fraud, in violation of 18 U.S.C. § 1343.

**THIRD CLAIM FOR RELIEF**
**18 U.S.C. § 981(a)(1)(A)**

94. The allegations above are incorporated by reference as though fully set forth herein.

95. The defendant assets **Wells Fargo x7500, Chase x6970**, **wallet address wMHf6**, and **wallet address 2Tvhe** are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) because they are property involved in, or traceable to property involved in, the operation of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, an offense punishable by imprisonment for more than one year. Capstone operated an unlicensed money transmitting business through its Wells Fargo, Chase, and Citi accounts, receiving funds from and transmitting funds on behalf of persons and businesses located in multiple States and foreign countries without the money-transmitter licenses required by those States.

///

///

///

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that:

1. Process issue according to the procedures of this Court in causes of action *in rem*;

2. Any person having an interest in said defendant assets be given notice to file a claim and to answer the complaint;

3. The Court enter a judgment of forfeiture of said defendant assets to the United States; and

4. The Court grant such other relief as may be proper.

Dated: October 26, 2026

ERIC GRANT
United States Attorney

By: /s/ Kevin C. Khasigian
NICHOLAS M. FOGG
KEVIN C. KHASIGIAN
Assistant U.S. Attorneys

**VERIFICATION**

I, Jennifer Barnard, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Amended Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Amended Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States and information supplied to me by other law enforcement officers, together with others, as a Special Agent with the Federal Bureau of Investigation.

I hereby verify and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief.

Date: October 26, 2026

/s/ Jennifer Barnard
JENNIFER BARNARD
Special Agent
Federal Bureau of Investigation

(Signature retained by attorney)